## DOUGLASS *vs.* HOWLAND.

Where one party agrees to *account* and pay over such sum as shall be found to be owing by him, and a third person *covenants* that the party thus agreeing *shall perform the agreement*, an action lies against the covenantor or *guarantor* without *notice* from the covenantee of the non-performance of the principal.

A *decree* in chancery against the principal, in a cause on a bill filed *to compel an account*, is not evidence against the guarantor, unless he had notice of the suit, and an opportunity given to defend in the name of his principal.

A *covenant* under seal, is not within the statute of frauds requiring an agreement to be in writing, *expressing the consideration*.

In a *simple contract*, the *consideration* must appear on the face of the writing, or in other words, be *expressed* by it ; but it need not be in any particular *form*—it is enough, if from the instrument, by reasonable construction, the consideration can be collected. Collateral facts or surrounding circumstances to which the promise has reference, may be looked at to give effect to the contract. A consideration *implied* or *inferred from the terms* of the instrument, is as effectual as if *expressly* appearing on its face.

A promise to answer for the debt, default or miscarriage of another, purporting to be made *for value received*, is a sufficient *expression of the consideration*, within the meaning of the statute ; *the* particular consideration need not appear ; it is enough that there be *a* consideration.

*It seems* that the doctrine of *notice of non-performance* applicable to *negotiable paper*, does not govern in the case of *guaranties*, where the *guarantor* undertakes *absolutely* that his *principal* shall perform. If it be intended that *notice* shall be given, it must be provided for in the contract ; otherwise, the guarantor must inquire of his principal. So also, *it seems*, that the same rule prevails in regard to notice of *acceptance* of a *guaranty*.

*THIS was an action of covenant, tried at the Herkimer circuit, [ *36 ] in November, 1838, before the Hon. JOHN WILLARD, one of the circuit judges.

On the 2d September, 1833, articles of agreement were entered into between the plaintiff and one *George W. Bingham*, whereby it was mutually agreed that an account should be stated between the members of two mercantile firms which had theretofore existed, and in which *Bingham* had been a partner ; the plaintiff engaging to pay to Bingham such sum as upon such accounting should be found due *to* him, and Bingham engaging to pay to the plaintiff such sum as should be found due *from him*. On the same day, an instrument in writing, written underneath the articles of agreement, was executed under the hand and seal of the *defendant*, in these words : " *For value received*, I do hereby covenant and agree with the above named Benjamin Douglass, that the said *George W. Bingham* will well and faithfully perform on his part the above agreement." On these instruments the action was brought. The plaintiff in declaring set them forth, and after averring performance on his part, of all the stipulations contained in the agreement on his part to be performed, alleged that Bingham was indebted to the said mercantile firms in the sum of $1500 ; that he *would not account* or *suffer an account to be taken*, according to the tenor and effect of the articles of

agreement, and wholly refused so to do ; that he, the plaintiff, was obliged to and did file a bill in chancery to compel an account. That such proceedings were thereupon had, that subsequently a decree was made in the court of chancery, adjudging Bingham to pay to the plaintiff the sum of $836,-56, with the interest thereof from 6th August, 1835, together with the costs of the plaintiff to be taxed ; and which were subsequently taxed at $200 ; of all which it was alleged the defendant had notice. He then alleged for breach, that the defendant had not caused Bingham to perform, fulfil and keep all things in the articles of agreement contained on the part of Bingham to be performed, fulfilled and kept, although often requested, [ *37 ]   &c.   And so, &c.   The defendant pleaded, 1.  *Non est factum ;  2.  That Bingham *was not indebted* to the two mercantile firms in the agreement mentioned.

On the trial of the cause, the plaintiff read in evidence the *articles of agreement* set forth in the declaration, and offered to read the *covenant* of the defendant endorsed thereon, which was objected to by the defendant's counsel as being within the statute of frauds, and therefore void ; the objection was overruled and the covenant read.   The plaintiff then offered in evidence the enrolment of the *decree* against Bingham, as set forth in the declaration, which was objected to as inadmissible, the defendant in this cause *not being a party thereto*.   The objection was overruled and the decree read : from which it appeared that Bingham put in an answer, that he was *decreed* to pay the sum mentioned in the declaration, and that the costs were taxed at $184,12.   The plaintiff also read in evidence an exemplification of an execution issued upon the decree and a return of *nulla bona*, &c.   Upon this evidence the plaintiff rested.   The defendant's counsel moved for a *nonsuit*, upon the grounds : 1. That the covenant *not expressing any consideration*, was within the statute of frauds and void, although under seal ; 2. That the *decree* was not proper evidence to charge the defendant, he not being a party to the suit in chancery, and it not having been shewn that he had notice of that suit ; and 3. That no action would lie until after *demand* and *refusal* to pay.   The motion was denied.   The defendant then offered to prove that *Bingham* was *not indebted* to either of the firms mentioned in the articles of agreement specified in the declaration : the plaintiff objected and the proof was excluded.   The counsel next insisted that the defendant was not liable for the payment of the costs of the suit in chancery ; but the judge ruled otherwise, and the jury under his charge found a verdict for the plaintiff for $1235,07 damages and six cents costs.   The defendant having excepted to the various decisions made against him, moved for a new trial on a bill of exceptions.

[ *38 ]      *S. Stevens*, for the defendant, submitted the following points :

I. The covenant of the defendant, upon which this action is brought, is within the statute of frauds, and therefore void. *The consideration is not expressed in the covenant*, and the fact of its being under seal, does not take it out of the statute. 2 *R. S.* 135, § 2. *Rogers* v. *Kneeland*, 13 *Wendell*, 114. Where the statute directs what a written instrument shall contain to make it valid, such direction must be complied with, or the instrument is void. The addition of a seal to a written instrument does not and cannot supply the omission of words required by the statute to give such instrument validity. A seal, at most, only *implies a consideration* —the statute in question requires *the consideration to be expressed in the instrument*. Previous to the revised statutes, it was not necessary that the consideration should be expressed. If the court could *spell out the consideration*, or if it could be fairly *implied* from the contract, it was held to be sufficient. But the revised statutes have altered the law on this subject. Now the consideration must be expressed in the instrument itself. The court are not at liberty to spell it out, or imply it, if not expressed in the contract. *Packer* v. *Willson*, 15 *Wendell*, 343.

II. The defendant is not liable to an action upon his covenant to the plaintiff, until after actual notice of Bingham's default to perform the contract between him and plaintiff, and a special request or demand of performance by defendant. There is no time mentioned in the contract between plaintiff and Bingham, when it is to be performed. Consequently neither could sustain an action against the other upon that contract, without a special demand of performance, and reasonable time given. *Osborn* v. *Lawrence*, 9 *Wendell*, 135. *A fortiori*, the guarantor of Bingham is entitled to notice of default and demand of performance.

III. The circuit judge erred in admitting the decree of the court of chancery in favor of the plaintiff against Bingham, as conclusive evidence against the defendant: 1. The decree was not legal or proper evidence against the defendant, for the purpose. He was not a party or privy to it, or *to the cause in which it was made, nor had he any knowledge or [ *39 ] notice whatever of it. He could not, therefore, be affected by it. 1 *Phil. Ev.* 222, ch. 2, § 1. 1 *Starkie's Ev.* 191, § 60. *Case* v. *Reeve*, 14 *Johns. R.* 79, 81. *Maybee* v. *Avery*, 18 *id.* 352. 2. But, at most, the decree was only *prima facie* evidence. It was not conclusive upon the defendant.

IV. The judge also erred in rejecting the evidence offered by the defendant. Under the issues joined in this cause, the defendant certainly had a right to give the evidence offered. It was simply offering to prove his second plea, and the evidence offered was legal, pertinent and proper, and should have been admitted by the circuit judge.

V. The defendant was not liable for the costs of the chancery suit in fa-

vor of the plaintiff against Bingham.   The judge therefore erred in deciding that the plaintiff was entitled to recover the amount of the taxed bill, with interest from the time of taxation.

*J. A. Spencer*, for the plaintiff, urged, I. That the covenant of the defendant was not within the statute of frauds : because, 1. The agreement was in writing, acknowledging a consideration on its face ; 2. The seal im‑ports a consideration *prima facie ;* 3. It will be deemed a part of the original articles of agreement—the covenant of the plaintiff on a good consideration.

II. The enrolment of the decree in the court of chancery was properly admitted in evidence against the defendant.  Howland had covenanted, *first,* that Bingham should account and state a balance ; and *secondly,* that he should pay such balance to Douglass.   If Bingham had accounted voluntarily with Douglass, and had struck the balance, can it be pretended that Howland would not have been concluded by it ?   Douglass compelled him to account by bill, and he did appear and account, and a balance was struck.   Is he not equally concluded ?   There was no necessity to make How‑land a party to the *accounting*, whether voluntary *or compulsory.   He had fully authorized the plaintiff to treat and account with *Bingham.*

[ *40 ]

III. The amount of recovery was right.   The costs were damages consequent upon the breach of the covenant to state an account voluntarily.   The whole amount found due on accounting are damages, because Bingham did not pay as he had covenanted to do when the account was stated.

*By the Court,* COWEN, J.   The statute provides that, in the following cases, every agreement shall be void, unless such agreement, or some note or memorandum thereof *expressing the consideration,* be in writing, and subscribed by the party to be charged therewith : 1. Every agreement, that, by its terms, is not to be performed within one year ; 2. Every *special promise* to answer for the debt, default or miscarriage of another person.   2 *R. S.* 70, *new ed.* § 2.

It is objected that though the guaranty of the defendant be subscribed by him, it is void as not expressing the consideration.  I have no doubt that the words " for value received," are a sufficient expression within the meaning of the statute.   *Watson's ex'rs* v. *M'Laren,* 19 *Wendell,* 557, 563.  But the guaranty itself is not within the statute ; therefore, there was no need of any such expression.   The statute in terms speaks only of a *special promise* to answer, &c.   The instrument declared on is a covenant, the seal of which imports a consideration.   I know a doubt was thrown out, upon this point, by the learned chancellor, in *Rogers* v. *Kneeland,* 13 *Wendell,* 121.   We

think, however, without foundation, whether the words or the spirit of the statute be considered. It has been said in another case, that since the statute, where the guaranty is a simple contract, a more direct expression of consideration is necessary than under the former act. *Packer* v. *Willson*, 15 *Wendell*, 343. In that case, there was no consideration collectable from the words of the guaranty, within any of the English or American cases. The words were, simply, " I guarantee the payment of the within note in six months."

*So "I guarantee to you the payment of the above," written under [ *41 ] an account current. ˉBewley v. *Whiteford*, 1 *Hayes' Irish Exch. R.* 356. To imply a consideration in such cases, requires the merest straining of the fancy, and would be directly to overrule *Wain* v. *Warlters*, 5 *East*, 10, which held that a consideration must appear on the face of the writing ; in other words, be expressed by it. That rule had been followed in England by allowing expressions more or less direct, but has never been overruled there. By the courts of some of the neighboring states, the rule had been questioned, and indeed repudiated, as not within the old statute, and it did not pass without some question even in England. In such a posture of things, to remove all doubt of its being adhered to, the legislature, when they came to revise the statutes, enacted the rule. The difference between the old and new statute, as mentioned by the revisers in their note, is " the requiring the consideration of the agreement to be *specified*." 3 *R. S.* 656, 2d ed. The marginal note to *Wain* v. *Warlters* is, that the agreement was holden void, because the consideration was not *stated*. Whether we say it must be *expressed* as in the statute, *specified* as in the notes, or *stated* as in *East*, it appears to me the intent must be the same. The principle is, that the consideration, being an important part of the agreement, should be made apparent in writing, as well as the promise. That either should be *expressed* in any particular way, is contrary to the analogy of the law, which requires courts to construe the language of all contracts according to the intent of the parties, and at the same time with the view *ut res magis valeat quam pereat*. That in any of them, we must often labor to find the intent, is true. In the language of Tindal, Ch. J. in *Morley* v. *Bothby*, 10 *Moore*, 395, 3 *Bing*, 107, *S. C.*, which in *Packer* v. *Willson* is doubted for law with us, how often are we put to find the meaning by *fair inference* from the language, or as it were, *to spell it out*. The latter is but a figure of speech ; but if taken literally, does it follow that the consideration is the less *expressed* because we are obliged to *spell* out the meaning ? All that Tindal, Ch. J. declared, was but another mode of saying that this *part of the contract is open to [ *42 ] the rules of construction the same as the other parts. The commencement of his very phrase is, "If you can, by reasonable *construction, collect* from it the consideration, it is enough." A thing is not the less *express*

*ed*, because it might have been plainer. The legislature do not enact it shall not be obscurely expressed, nor could they with any propriety till human nature is remodelled. They prescribe no exact form. It may be in figures, abbreviations, in a foreign or dead language; defective in spelling or syntax, elliptical, ambiguous. Some of the most difficult cases on the rule respecting the *ambiguitas latens* of written contracts, have arisen on these guaranties. You are to see what they mean in such case by looking to collateral facts, or surrounding circumstances. You do this in order to sustain the most solemn contracts, such as deeds or wills. An abbreviation may be explained by an expert. Even records and judicial proceedings are often quite obscure, till you look abroad and connect them with what they are speaking of. Are all these and the like analogies to be violated, because the phrase to be construed happens to make part of a contract under the statute of frauds. I agree that *Rogers* v. *Kneeland*, 10 *Wendell*, 218, 250, presents, both in the case itself and the books cited by Mr. Justice Nelson, a fair specimen of the English construction under the rule in *Wain* v. *Warlters*. *Rogers* v. *Kneeland* raised a question of latent ambiguity. The expression of consideration was to be made intelligible by looking out of the contract in question for other transactions and contracts, express or implied, to which the guaranty had reference. In commenting upon the English cases, Mr. Justice Nelson observes: "A consideration *implied or inferred from the term* or *language* of an instrument, is in judgment of law contained in it." What is this but saying it is *expressed*, perhaps in a general way. You say a man made a *feoffment :* that is saying he made *livery of seizin*, though the latter words are not used. *Feoff-* [ *43 ] *ment* \*implies *livery*—therefore, the latter is expressed just as well and better than if the word *livery* had been used. Whatever then may be fairly *implied from the language* is *expressed*. I will add the cases cited in *Fell on Guarantees* 42, *Theobald*, 13, and especially the late case of *Shortrede* v. *Cheek*, 1 *Adolph. & Ellis*, 57, decided since *Rogers* v. *Kneeland*, but in the same spirit. The former is cited by Mr. Wigram as a striking illustration of the length to which courts will go in looking to surrounding circumstances, with a view to apply the words of a guaranty. *Wigr. Extr. Ev. addendum* before *p.* 1, *Lond. ed.* 1835· That case related both to the *expression* of consideration and *promise*. It was insisted that the writing should be so plain as to supersede the resort to parol testimony. But the court resorted to precisely the same rule for deciphering the meaning as they would in respect to a will. Mr. Wigram puts the case by the side of one on a will decided in the court of chancery. "The result of all," says Joy, Ch. Baron of the Irish exchequer, after a very full review of the cases as they stood in 1832, "is, that the consideration must *clearly appear* upon the guaranty itself, either by *express* statement or *necessary implication*." 1 *Hayes' Rep.* 364, in *Bewley* v. *Whiteford*, before cited.

New-York, May, 1840.—Douglass v. Howland.

I have said so much, because I perceive, not only from what was said in the argument of this cause, but what has fallen from the bar on several other occasions, that when we come to agreements depending on the statute of frauds, it is supposed that all our powers of construction are paralysed; that the words " *expressing* the consideration" must have a meaning different from the same words had they been used to define the requisites of any other instrument. I answer, you cannot escape the power of construction, so long as you have a judicial system. The very position contended for involves the power. What, is such an *expressing* so direct, as to leave no room for exerting the power? The answer itself must say, " According to my construction of this clause, it is to plain to admit of *construction*, or so obscure as to require it." The argument, if allowed, would only give the power another direction, by putting it to follow *the rules [ *44 ] furnished by Johnson or Murray, instead of the rules of law; to raise a verbal or grammatical construction instead of a legal one. We were told on the argument, for instance, that the words " for value received," used here, will not satisfy the statute, although confessedly good in all other contracts under the sun. Why not? The learned counsel replied to that question, " we admit they express *a* consideration; but not *the* consideration. The statute, you will observe, uses the word *the*, not *a*." It is said the construction of the statute of frauds has already cost several millions of pounds sterling; and if the new road of construction on letters and articles be once opened, it is to be feared that a still greater expense will not be the worst evil. There is hardly a contract on earth, nor can there be under the statute of frauds, that would not be open to attack. Business men and courts of justice are unmoored; and litigation becomes interminable. Let us judge of this by the history of the statute before us. That was thought to have been drawn as *expressing* the intention of the legislature. It is said by *Lord Ellenborough*, 10 *East*, 17, to have been drawn by Lord Hale, " one of the greatest judges," he adds, " that ever sat in Westminster Hall, who was as competent to *express*, as he was able to conceive," &c. Yet under all these advantages, nearly a century and a half had elapsed, when Lord Ellenborough was speaking, (A. D. 1804,) before the meaning of Lord Hale's *expression* had been settled; and construction, at the end of nearly two centuries, is still going on. If, in construing the *new* words which have lately found their way into the statute, we must have *new* rules, and these be adapted to the infinitely various modes by which men of all sorts may choose to speak, we must submit to the consequences, be they never so onerous. I will only say, that we ought not, without strong necessity, to surrender the degree of approximation towards certainty, which we may otherwise claim to have been made. Rules of construction make the law as well as the statutes; and lightly to depart from them without necessity, would be to incur

[ *45 ]  the denunciations of Lord Hale himself, against precipitate and inconsiderate innovations in the law.  " There *is," says he, " that contignation, as I may say, of most laws with others, that it may be of great importance, that while men over-hastily and unwarily go to make an alteration in that which they conceive amiss in a small matter, they may endanger a part of the main fabrick."  *Hargr. Law Tracts*, 257, 261, 2 *Dubl. ed.* 1787. Once give up the rule that a reasonable construction shall be applied to effectuate the expression in a written  guaranty, and courts will soon be called on for the same strictness in passing on all other instruments.  Every thing that has been done towards settling the meaning of men's contracts may  thus be disturbed.  There is no uniform mode of expressing things.  We have held again and again that a seal expresses a consideration, within the  meaning of the statute.  It expresses it in the same sense that Lord Hale's word *agreement*, in the statute itself *expressed* a consindration.  The word *imports* a promise with a consideration annexed.  The seal *imports* a consideration.  I say such a man has made a *contract* ; I express both consideration and promise, as plainly as if I had enumerated both in so many words.  The term contract being complicated of both, expresses both.  It conveys to the mind a complex idea.  So of every general word.  Its compass of *expression* is wider than if it aimed at a simple uncompounded idea.  It then *expresses* parts or elements.

There are besides well known rules in the construction of statutes, which ought not to be departed from.  Where the statutes are in mere affirmance of the common law, the course of adjudication is not altered by them.  The rule clearly includes any new statute which may have been enacted in affirmance of judicial construction upon a former statute.  Nor ought the new enactment to be holden a deviation from the former law, unless it be obviously so.  There is scarcely any branch of legal policy more worthy of being enforced than that which aims to keep the laws of a nation the same in all respects, from one age to another, except in points where change becomes absolutely necessary.  Time, says Lord Hale, is wiser than all the wits in the world ; and the law which has been tried by it, has the highest [ *46 ]  possible evidence in its favor.  Time, too, is the school 'master which teaches law most effectually, and without which it cannot be generally known.  It must, I think, have been remarked by every lawyer who has examined the present revised statutes, that a great deal of them is made up of enactments intended merely to repeat what had been decided by our own or the English courts.  That was not always done in the language of the reports, as we have seen it has not been done in the enactment of *Wain* v. *Warlters*.  The same thing may be said of many mere rules of court.  It is equally true of the old statutes themselves, wherein changes of some kind occur at every step in the revision.  All the general acts were

New-York, May, 1840.—Douglass v. Howland.

remodelled. An arrangement more sientific, a style improved in elegance and simplicity were sought to be introduced throughout the whole. Hence, short paragraphs made up of short sentences; generalities, ellipses, implications, equivalent words, or translations for old and well defined technical terms. In short, the old costume was dismissed, and that of the civil code ? of France adopted, as nearly as could be. Yet I take it that the main substance of what we had before, was always intended to be retained. The revision was mainly a reenactment or codification of the substance, the principle of what we had before, though I admit the identity cannot easily be ascertained in very many instances. To do this with the least hope of success, both the old and the new systems must be studied and compared, aided by the revisers' notes and their marginal references. The object is worth all the labor it costs; for when once attained, we have the explanations of the old system to aid in understanding the new one. It cannot be, that the formal changes I have mentioned, mean a change in substance. The transmutation of a principle of the common law, or a rule of practice into a statute, or an old statute or its received construction into a new one, without a palpable design to depart from the former, ought not to be considered as a departure. We are thus left where we were with all the old helps about us; the old lights burning. To pursue a contrary course, would be to love darkness rather than light. It seems to me that the rule settled by our venerable predecessors *in respect to the revision of old stat-          [ *47 ] utes, applies with full force to a revision and enactment of any branch of the law. It was thus laid down by Chief Justice Kent and Mr. Justice Spencer : " Where a law, antecedently to a revision of the statutes, is settled, either by clear expressions in the statutes, or adjudications on them; the mere change of phraseology shall not be deemed or construed a change of the law, unless such phraseology evidently purports an intention in the legislature to work a change." *Yates' case*, 4 *Johns. R.* 359. *Taylor* v. *Delaney*, 2 *Caines' Cas. in Er.* 150, 151. " A contrary construction," says the last case, " might be productive of the most dangerous consequences. The quaintness of expression in some of the ancient British statutes, the circumstance of there being several statutes on the same subject, required in many cases an entire change of language ; but it has never till now been contended, that thereby an alteration of the law was to be inferred." *Per Spencer, J. in* 1805. In this, Kent, Ch. J. himself one of the revisers of 1801, concurred, and repeated and enforced the rule in *Yates' case*, A. D. 1809. If a contrary course would be most dangerous in 1805, when as yet revision had proceeded by cautious and prudent steps, fearful to go even beyond a change of orthography, what shall we say of an age when there is literally a mania for changing every law in some way ? If Lord Hale, of mighty intellect, and giant frame, which enabled him to labor 16

hours out of 24, in its improvement, could not draw a single new statute capable of being well understood and usefully applied, short of two centuries and millions of expense, how very important is it, that, among many entire enactments and many interpolations confessedly novel, the old and familiar parts of the system should not be confounded with them. By care in this respect, much evil may be averted. Lord Hale compares the man who is ravenous for much legislation, to him " that will for every small matter be altering of his house. As he will ever be meddilng and never be at rest; so he may, before he is aware, endanger the whole fabric, while out of an over curious nicety he is impatient of every little defect." The [ *48 ]     *rule adopted by our predecessors will at least mitigate that evil.

It will serve as a prop to those parts which were not intended to be displaced, while it will leave every thing really new to perform its appropriate functions with less injury to the general system. It would be equally idle, as out of season, to reiterate the scathing denunciations of Lord Hale against a spirit of legislative tampering. No one, not ambitious of a failure, would oppose himself to an earthquake like that which he resisted, even though it were raging with greatly mitigated fury. The evil, if it be one, is upon us. If the building totter, we can only act the part of humble mortals, by propping and tying it. Hale has been compared by a distinguished American orator, to a descended god. Such a being could reach and subdue the power which shook the foundation of the building. The creed which he promulgated will not be without its use, however, as fortifying the rule adopted and acted upon by our predecessors. Both are but commentaries on the maxim *via antiqua via est tuta.*

The second point now made by the defendant is, that no notice of Bingham's default was proved. The breach was in refusing to account, and to pay the money on the decree, though the plaintiff had done the several acts on his part required as a condition precedent to Bingham's liability attaching. Under such a state of things, it is not denied that Bingham himself was liable ; and the defendant covenants that he should perform and fulfil his obligations. If the defendant were liable at all, he was so without notice from the plaintiff. It is a general rule, that where one guaranties the act of another, though on condition, his liability is commensurate with that of his principal, and he is no more entitled to notice of the default than the latter. Both must take notice of the whole at their peril. *Somersall* v. *Barnaby*, *Cro. Jac.* 287. *Atkinson and Rolfe's case*, 1 *Leon*, 105. These were cases of a promise to indemnify against liabilities to be incurred for another; and it was held that no notice of their being incurred was necessary, or that they had been paid. So where the defendant promises to pay [ *49 ]     *what should appear to be due from the plaintiff to his attorney. *Pitman* v. *Biddlecombe*, 4 *Mod.* 230. In *Smith* v. ——, 11 *id.*

48, Holt, Ch. J. said, where either party can obtain notice on his own inquiry, there, none need be given. 2 *Salk.* 457, *S. C., nom. Smith* v. *Goff. Harris* v. *Ferrand, Hardr.* 36, *S. P.* In *Brookbank* v. *Taylor, Cro. Jac.* 685, the promise was, that the defendant would pay the plaintiff the rent due from another, if the latter did not pay it. Held that the defendant must notice the non-payment at his peril. *Williams* v. *Granger,* 5 *Day,* 444, *S. P.* In all these and the like cases, if the defendant intend to insist on notice or request, he must expressly make it a condition of his contract, as was done in *Berks* v. *Tippet,* 1 *Saund.* 32. Without such a precaution, the engagement is considered as absolute to pay on the happening of the condition. This was held of a promise to repay the plaintiff £20 if he disliked the article for which he had advanced the money. *East* v. *Thoroughgood, Cro. Eliz.* 834. This case I admit to be questionable, as the condition was a secret, lying in the plaintiff's own breast; and the contrary has been several times resolved, and seems to be settled, because the matter lies not only more properly but exclusively in the plaintiff's own knowledge. *Comyn's Dig. Plead. C.* 73, *Condition L.* 8, 9. *Brable* v. *Hollywell, Cro. Eliz.* 250. *Henning's case, Cro. Jac.* 432. *Holmes* v. *Twist, Hob.* 51. 1 *Rol. Abr.* 463, *S. C. at pl.* 15. *Id. pl.* 18. But in the case at bar, the defendant had only to enquire of his principal, for whom he had undertaken absolutely that he should perform. The case is, therefore, stronger against him than any which have been cited. And the familiar one, of an award. If the submission expressly require notice, it must be given; otherwise the party must enquire of it, and pay the sum awarded at his peril, even though the whole proceedings were *ex parte.* 1 *Chit. pl.* 286, *Am. ed. of* 1828 ; *Harris* v. *Ferrand, Hardr.* 42 ; *and see* 1 *Saund.* 33, *note* (2) *and the cases there cited; Comyn's Dig. Plead. C.* 69.

I am aware that there are a class of cases which hold that under a contract guaranteeing a debt yet to be made by another, the guar- [ *50 ] antor is not liable to a suit without notice that the guaranty has been accepted and acted upon. Indeed, they go farther: if notice of accepting the guaranty be not given within a reasonable time no debt whatever arises. *Babcock* v. *Bryant,* 12 *Pick.* 133. I will only say, that these cases have no foundation in English jurisprudence, where the adjudications are numerous, and clear the other way. *Harris* v. *Ferrand, Hardr.* 36. 42. In *Com. tit. Plead. C.* 75, it is said on a promise to pay, on the performance of an act by the promisee to a third person, the promisee need not give any notice ; for the promisor takes it on himself to get notice at his peril. And *vide* as to a guaranty of a debt already *due, Warrington* v. *Furbor,* 8 *East,* 242; *Swinyard* v. *Bowers,* 5 *Maule & Selw.* 62. All the cases requiring mere *guarantors* to be treated as *endorsers,* rest on *dicta* of two distinguished

American judges, in cases of a mixed character, where the defence, it was agreed, would be complete, independent of any such ground. *Marshall, Ch. J, in Russell* v. *Clark's ex'rs*, 7 *Cranch*, 69, 92. *Story, J. in Cremer* v. *Higgingson*, 1 *Mason*, 323, 340, *and Russell* v. *Perkins, id.* 368, 371. *Rapel* v. *Bailey*, 3 *Conn. R.* 438, the counsel cited no English books ; and all the learned court found there, was one case, in which they remark that Eyre, C. J. *seemed* to have been of opinion that, in guarantees for good behavior, notice of any embezzlement ought to be given in a reasonable time. *Peel* v. *Tatlock*, 1 *Bos. & Pull.* 419. The decision was finally rested on the dictum of Chief Justice Marshall, and was very strong in favor of the guarantor. It was on a guaranty to pay for goods deliverable to another, on such terms as the guarantee and the principal should agree on, if the principal did not pay ; and though strictly followed by a sale and delivery to the principal, and a default on his part to pay, yet it was held that no action would lie ; at least, till notice of the circumstances had been given by the plaintiff to the surety. Other cases hold guarantees of this character to almost the same degree of strictness in giving notice to guarantors, as the law merchant has introduced between endorsees *and endorsers.

[ *51 ]     *Green* v. *Dodge*, 2 *Ham. R.* 430, 439, 440. *Norton* v. *East-*
    *man*, 4 *Greenl. R.* 521. In the latter case, a like principle was imputed to a decision of this court in *Stafford* v. *Low*, 16 *Johns. R.* 67. The latter, however, merely holds that a declaration made to another of a willingness to become a guarantor, *if required*, would not render the declarant liable as a guarantor, without a compliance with the *express condition*, which means giving notice. In short, that the letter on which the plaintiff based his claim, did not amount to a guaranty. *Id.* 69, 70. *McIver* v. *Richardson*, 4 *Maule & Selw.* 557, was there cited as a case of similar character. *Beekman* v. *Hale*, 17 *Johns. R.* 134, puts both of the former cases on that footing, and acts upon them, adding, there must be notice or a subsequent consent to become a guaranty. Such cases are exceptions to the general rule, that notice is not required. They are cases of express condition, like *Birks* v. *Tippet*, already cited from Saunders. And *vide* 1 *Saund.* 33, *note* (2). *Com Dig. Plead. C.* 69. It is proper to say that this place in Comyn's Digest is cited by Putnam, J. in *Babcock* v. *Bryant*. But the cases cited by Comyn are like those in the note to 1 *Saund.* 33, where the request or notice is expressly required. "There," says Sergeant Williams, " the request is parcel of the contract." All the cases cited by him are of collateral matters, to be done on request, by the very words of the contract ; and even these cases do not extend to a proper debt or duty of the party promising   There though he by words, make the request or notice a condition, yet the bringing of the action is a sufficient notice, and such is the very first case cited in the note. *Yelv.* 66. *Vide Com. Dig. Plead. C.* 70.

I forbear to search farther for the English law, after the admission implied by *Douglass* v. *Reynolds*, 7 *Peters*, 113, 125. The question was there examined by Mr. Justice Story. The only English cases cited by him, are *Oxley* v. *Young*, 2 *H. Black.* 613, and *Peel* v. *Tatlock*, the latter being also noticed, as mentioned before, by the supreme court of Connecticut. In *Oxley* v. *Young*, the surety was holden liable ; and I do not find any countenance given to the *idea, that notice was necessary by [ *52 ] way of condition. The defendant ordered goods for another, and guaranteed that he should pay for them. They were accordingly shipped to him by the plaintiff, the guarantee. It is true that notice of the shipment was given to the defendant ; and he sought to raise a defence, on the subsequent neglect of the vendor. Eyre, C. J., said the right to sue on the guaranty attached, when the order was put in a train for execution, subject to its being actually executed ; and the right could not be divested, even by the wilful neglect of the vendor. As to *Peel* v. *Tatlock*, it has been impossible for me to perceive that even an intimation was intended of notice being essential. The difficulty felt by Eyre, C. J., seems to have been, whether the creditor had not defrauded the guarantor by industrious concealment. I may then I think repeat with great confidence, that all the cases requiring notice are American, and depart from the rule of the common law. *Douglass* v. *Reynolds*, as Mr. Justice Story observed, may be sustained by the *dictum* of Chief Justice Marshall ; and indeed by *Edmondstone* v. *Drake*, 5 *Pet.*, 624, where the court, with that learned chief Justice at its head, carried the dictum into a *direct adjudication*. No English case is claimed by Mr. Justice Story, in any of his decisions, as sustaining the doctrine in the least. C. J. Marshall does not even cite one, in his opinions.

The short answer which English cases, decided long before our revolution, furnish, is, that the guarantor, by inquiring of his principal, with whom he is presumed to be on intimate terms, may inform himself perfectly, whether the guaranty were accepted, the conditions fulfilled and payment made. Where that can be done, the cases all hold that notice is not necessary, even as preliminary to the bringing of an action, much less to found a right of action. The only exception is the well known one of collateral parties to bills of exchange or promissory notes. *Vid. Philips* v. *Astling*, 2 *Taunt.* 206.

*Thirdly*, it is strenuously insisted, and, as I think it will appear, with great propriety, that the decree was not evidence against the defendant. Standing as it did against *Bingham alone, it was certainly not evi- [ *53 ] dence, *proprio vigore ;* and, if receivable at all, it must be on the ground that the defendant has made himself privy to the suit in equity, by his covenant. All those cases, therefore, cited on the argument to show that one man cannot be affected by a judgment, or decree against another, who is not privy to it, may be dismissed at once, for all purposes, except as show-

ing the reason why that is so.  The objection is, that the party sought to be affected had no opportunity to examine witnesses, or in any way litigate the matter in controversy, either originally or by appeal ; and may, therefore, be wronged beyond measure, by others proceeding collusively behind his back.  1 *Phil. Ev.* 321, *Cowen & Hill's ed.*  *Case* v. *Reeve,* 14 *Johns. R.* 79, 81.  *Maybee* v. *Avery,* 18 *Johns. R.* 352.   1 *Stark. Ev.* 217, *Am. ed.* 1837.  It is admitted in the books cited, that the verdict is not only evidence against the immediate parties :  but against *all claiming under them ;* which very nearly expresses the meaning of the word *privy,* when used to signify those persons off the record, who may be affected to the same extent as if they were parties.   It means any one who takes the subject matter of litigation, after the suit is determined, or, in some cases, while it is pending.   He is either a privy in blood, as an heir on whom the estate in litigation descends ;  a privy in estate, as one who takes by conveyance ; or a privy in law, as one who takes a right of dower.  1 *Phil. same edition,* 321.   In all these cases, the reason is obvious ;  the heir, purchaser, &c. always come in subject to any act or default of the predecessor, by which the title may have been affected.  But, subject to this exception, the law is extremely jealous of the rights of all who are not actual parties, even though they may appear and be made so.   Thus, in a suit against one of two joint-debtors, were it not for the statute making the judgment evidence to a certain extent against the other, it cannot be doubted that the proceeding would be altogether nugatory, for the purpose of establishing the truth of the claim against him ;  although it might, in a suit for contribution, be received, as every record may, against whatever person, to prove *rem ipsam.* 1 [ *54 ]  *Stark. Ev. Am. ed.* 1837, *p.* *215.   Vid.   Deering* v. *The Earl of Winchelsea,* 2 *Bos. & Pull.* 270.   Come then to the surety of a debtor.   Suppose the now defendant's name to have been signed to the original covenant of Bingham.   If he would not, standing there, have been bound by a suit and judgment against Bingham *alone,* with what propriety can he be held bound in a like proceeding here ?   In either case what is the covenant ?   That Bingham should account and pay over the balance found due ;  not that he should, on default, abide any decree in chancery, or judgment at law for not accounting.   With what propriety can it be said the defendant has incurred a greater liability by a separate guaranty, than he would by joining in the covenant ?   May he not say, when the plaintiff comes with his decree, *non hæc in fœdera veni ?*   Is there any thing in the nature of suretyship, which, at the common law, gives to this decree the force contended for ?   By the civil law, he would be bound.  1 *Evans' Poth.* 562, *Lond. ed. of* 1806.   *Laralde* v. *Derbigny,* 1 *Mill. Lou. R.* 85, 91.   The reason given by *Pothier* is thus :  " In consequence of the obligation of the surety being dependent upon that of the principal debtor, the

surety is regarded as the same party with the principal, with respect to whatever is decided for or against him." Again : " But the surety is allowed to appeal against this judgment, or to form an opposition to it, if it be in the last resort." Here is a reason founded both in the nature of the obligation, and the right to litigate the demand. So that, even at the civil law, a decree would be no more than *prima facie* evidence. At common law, where the guaranty is entirely collateral, as in the principal case, there is neither a right to litigate originally nor to appeal. Had the defendant gone into the court of chancery, he would have been dismissed as an intruder, on an objection by the complainant.

It is true he might so have framed his contract as to have undertaken for the decree : like special bail engaging for their principal ; or there may be an express stipulation *in pais* that the principal shall abide the event of the suit, as in *Patton* v. *Caldwell*, 1 *Dall.* 419. Something of the same nature are bonds of indemnity against actions, and cases, as *in    [ *55 ] Duffield* v. *Scott*, 3 *T. R.* 374. There an action and recovery against the obligee were held conclusive, even without notice, that not being expressly provided for in the bond. A *fortiori*, where notice has in fact been given. The case most familiar to us, is a limit bond, whereof it has been held that notice to indemnitors and a chance to defend shall render the judgment against the obligee conclusive in an action to recover over. *Kip* v. *Brigham*, 6 *Johns. R.* 158, 159. 7 *id.* 168, *S. C.* Codified, 2 *R. S.* 254, 2*d* ed. § 52. The same may be said of a warrantor of title. 6 *Johns. R.* 159, *and cases cited there.* The obligation of the sureties in a probate bond, that the administrator shall account, has been construed to mean an accounting in the proper court, and thus the decree has been let in as at least *prima facie* evidence against them. This is given as the result of various South Carolina cases, cited in *Cowen & Hill's Notes to* 1 *Phil. Ev. p.* 984. Such would it of course be, with all that class of bonds, so numerous in our present system, by which sureties expressly bind themselves that the principal shall abide the event of a suit ; as to pay costs, or principal moneys to be recovered, or return goods in replevin, &c. &c. Indeed, it is here plain, from the nature of the agreement, that the surety means to be concluded, always saving the right, as the law must in every case where a suit is between third persons, to contest the proceeding on the ground of fraudulent collusion, for the purpose of charging the surety. In *Hobbs* v. *Middleton*, 1 *Dana*, 176, 179, the court of appeals in Kentucky gave this effect to a judgment against a principal in an administration bond. Whether there be a clause in such a bond, which may, as in South Carolina, be construed specially to bind the surety, does not appear from the case. The court remark, that " the responsibility of securities, being incidental and collateral to that of the principal, a judgment in favor of a creditor, against

the administrator,"concludes the securities as to the existence and character of the debt thus ascertained, and cannot be questioned or reviewed on the official bond." Of course the court except cases of fraud. *Vide also Fountleroy* v. *Lyle*, 5 *Monroe*, 266. If the remark cited be *in-tended of sureties in general, who engage merely for their princi-pal doing some act *in pais*, it would go beyond any other case I have seen under the system of the common law. The doctrine has been denied in an action against the sureties of a sheriff, both in Pennsylvania and Virginia. *Carmack* v. *The Commonwealth*, 5 *Binn*. 184. *Munford* v. *Overseers of the poor of Nottoway*, 2 *Rand*. 313. In the *State of Ohio* v. *Colerick*, 3 *Ham. R.* 487, the judgment was, in such case, holden to be *prima facie* evidence, impeachable for collusion or mistake. Nearly the same effect seems to be collectable from the cases already cited from the Pennsylvania and Virginia reports, and other cases in the latter. *Jacobs* v. *Hill*, 2 *Leigh*, 393. In the latter case, even a judgment by voluntary confession was hold-en to have this effect. The earlier cases in Virginia will be found cited and commented upon in *Munford* v. *Overseers, &c. of Nottoway*. These cases, from Ohio, Pennsylvania and Virginia, hold the distinction, especially those of the two former states, that the judgment is either *prima facie* or *conclusive* evidence, according as the surety may or may not have had no-tice, and an opportunity given him to defend, which, of course, he may do in the name of the principal, with the consent of the plaintiff. In the lat-ter case, nothing is more reasonable. It brings the case to the ground of the civil law, and is we' have seen, countenanced by our own adjudications. Independent of that, however, independent of any clause specially binding the surety to pay judgments or decrees against his principal, independent of the identity and right of defence and appeal, which the civil law imputes to and confers upon the surety, it may, with great confidence, I should think, be asked, ought the surety to be farther affected than the merest stranger ? This question, I perceive, has been answered in the negative even by a court sitting under the civil law system, where the surety did not happen to be in such a posture as subjected him to the general effect of *res judicata* against the principal, under that system. One had become bound for the plaintiff to indemnify the defendant against loss by an attachment against him, if it should not be prosecuted to effect. It was not, and *dam-ages were in a distinct suit, recovered against the principal without notice to the surety. In an action against the latter, the court below re-ceived the record of recovery as evidence, *per se*, against him. But on ap-peal, the judgment was reversed : Derbigny, J. remarking, " there is no rule in our laws better understood, than that which allows the surety the right of availing himself of the same means of defence, (save those that are merely personal,) which the principal debtor could resort to. That princi-

ple is founded on the sacred maxim, that no one ought to be condemned without being heard ; and that consequently no person shall be bound by a a judgment to which he is not a party." *Lartigue* v. *Baldwin,* 5 *Mari. Lou. Rep.* 193. In this case too the record had been received by consent. But to that the learned judge gave the answer, that it was admissible for the purpose of showing the principal had been sued, and an execution against him had proved unavailable ; but that the judge *a quo* had improperly allowed to it any farther effect. For the purpose of proving the damages sustained, it was held entirely incompetent—no notice having been given, or opportunity for defence extended to the then defendant. This seems to us the reasonable distinction. In general it imposes no hardship on the plaintiff. He has but to serve a notice, with a consent that the surety may take up the defence, and hold all the rights of the principal in that respect, so far as the defence by a surety is admissible. In some cases, as is well known, it may be wider than that of the principal, as where time may have been improperly given by the creditor, or the claim is, in character, without the terms of the bond. The case which occurs to me is a debt charged against one as administrator, which is in fact due from him as an individual. It will of course be narrowed, where the defence of the principal is personal, as being founded on infancy or an insolvent discharge. In the very case before us, I perceive that the account of Bingham was agreed by the articles between him and the plaintiff, to be adjusted on certain specified principles ; whether more confined than those upon which the court of chancery proceeds, it is not necessary to inquire, though I imagine it *would [ *58 ] not be difficult to show that in some aspects of the matter, the agreed principles were more confined. How are we to know from the sweeping evidence of the decree, that the stipulated measure of the account may not have been entirely overgone ?

But I forbear to pursue the farther examination of the question upon principle ; and I do it the rather, because I perceive the very point has been decided, after an examination which seems to me entirely satisfactory, by two learned courts, one in Maryland, and the other in North Carolina. *Beall* v. *Beck,* 3 *Harr. & McHen.* 242. *Keller* v. *Bowell,* 4 *Hawks,* 34. The first was an action on a bond for the faithful performance of a deputy sheriff, who had been sued and a recovery had against him alone in a defended suit. On this being followed by an action against the surety, the recovery was held by the court of appeals, not admissible in evidence against him. The argument of the court is not given. The latter case was an action against a surety on his bond conditioned for the faithful performance of his principal as guardian. A decree had passed against his principal's administrator, in the probate court, on a petition for an account, answer and proofs taken. The decree was *de bonis intestati* and had been followed by a *fi. fa.*

and return of *nulla bona*. These proceedings were offered in evidence at nisi prius, as *prima facie* evidence in the suit against the surety, but rejected ; and the plaintiff nonsuited. A motion at the bar of the supreme court, to set aside the nonsuit, was denied. The cause appears by Mr. Hawk's report, to have been well argued ; and chief justice Taylor, who delivered the leading opinion, based the decision on a full consideration of the English cases as they then stood, and their grounds as compared with the reason of civil law for coming to a different decision. The authority of the case in this court decided on a limit bond is reviewed ; and not disapproved, merely because notice was there given. The opinion of Hall, J. in the same case is a very handsome summary of the arguments bearing upon the question. Both the learned judges advert to the analogy which repudiates the *admissions* of the principal as evidence *when offered to affect his surety. How perfectly well settled that notion is, both at Westminster Hall, and by a majority of the American courts, where the admission is not a part of the *res gestæ*, I have endeavored to show in *Cowen & Hill's* 1 *Phil. note* 485, *p.* 669.

[ *59 ]

I do not deny what was said at the bar, that, had Bingham voluntarily accounted on the principle prescribed by his covenant, the surety would have been liable for the balance· struck. The striking of such a balance would be an admission making part of the *res gestæ*. Indeed, that, and every act leading to or connected with it, would be the *res gestæ* themselves, for which the defendant undertook in his covenant. The distinction will be found fully presented and illustrated by the cases cited in the note to which I have just referred.

It follows, *a fortiori*, from what has been already said, that the remaining grounds taken at the circuit and repeated at the bar, are more than sustained. These are, that, at most, the decree was *prima facie* evidence ; that the defendant should have been allowed to show, under the second plea, that his principal was in fact never liable ; and that the defendant was at all events, not liable *for the costs of a chancery suit*, litigated without his being in any way privy to it, or having had a chance to defend.

That a surety, upon a general undertaking for his principal's paying a debt, can be made liable in any way for the costs of a suit against the latter solely, seems to be a somewhat extraordinary position. A man endorses a note, or signs a guaranty for payment ; not of costs ; but the debt ; what authority has any court for adding *costs* to the words of such a contract ? The case at bar is nothing more in principle. Bingham covenanted to account and pay the balance. He owed two things ; the accounting and paying. These made the debt. The defendant covenants that Bingham shall perform both ; in other words discharge his debt ; not that he should pay

*costs.* The latter obligation is without the bond. *Knight* v. *Hughes, Mood. & Malk.* 244, has some bearing in its principle. Lord Tenterden, C. J. The distinction is well illustrated by a *common bond [ *60 ] of indemnity, which you take against actions. There the obligor would doubtless be liable for costs, because they are directly incident to the action. They are virtually expressed by the bond. And yet for more abundant caution, costs are usually added ; such was the case of *Duffield* v. *Scott,* 3 *T. R.* 374.

A new trial is granted, the costs to abide the event.