Draiíe, Ch. J.,
dissenting:
I am unable to concur with the majority of the court in the judgment just rendered, and deem the main question in the case of sufficient importance to justify a full expression of the grounds of my dissent.
Whether the claimant shall recover the small sum of $204.00 is of little moment to any but himself; but aback of that lies a new and very important question as to the force and effect of the Devised Statutes, promulgated by the act of June 22, 1874, to revise and consolidate the statutes of the United States in force on the first day of December, anno Domini one thousand eight hundred and seventy-three.”
What those Devised Statutes were intended by Congress to embrace is not' only expressed in the title of that act, but also in its section 5595, in these words :
" The foregoing seventy-three titles embrace the statutes of the United States, general and permanent in their nature, in force on the 1st day of December, one thousand eight hundred and seventy-three, as revised and consolidated by commissioners appointed under an act of Congress, and the same shall be designated and cited as The Devised Statutes of the United States.”
This clear and explicit declaration precludes the idea that the act embodying the Devised Statutes was intended as legislation on the various subjects included in it. Prima facie, then, we are not justified in expecting to find there changes of previous laws.
*175 Nevertheless, it is quite certain that the Revised Statutes do contain such changes, and wherever they appear so ''clearly as to rebut the contrary presumption raised by section 5595, no court has authority to disregard them/
But when, in any chapter or in any section, the phraseology or the arrangement of clauses or words, or both, differ from the previous laws on the same subject, and. it is doubtful whether Congress intended by changing the phraseology or the arrangement, or both, to make a different law from that before existing, then it is the function of the judiciary, in a case properly presented, to declare what was the intention of Congress. This case is one calling for the exercise by this court of that function.
The claimant became a member of the Soldiers’ Home after the passage of the act of June 22, 1874, and his rights, as such, are therefore to be determined mainly by the portion of the Revised Statutes embraced in Chapter Two of Title LIX, including sections 4814H824; the question in controversy being more directly connected with section 4820.
Unless the provisions of that chapter changed the previous law, the claimant has no case. To determine that question, we must in the outset see how that law stood.
By section 1 of the Act of March 3, 1851 (9 Stat. L., 595), authorizing the establishment of the Soldiers’’ Home, it was required that all members of the Home should have contributed to its fionds, according to section 7 of the same act, which authorized twenty-five cents per month to be deducted for that purpose from every soldier’s pay. This was by section 7 of the Act of March 3,1859 (11 Stat. L., 431) reduced to twelve and a half cents per month.
By section 4 of the act of 1851 the classes of persons who should be entitled to the rights and benefits of membership in the Home were designated, as follows:
“ 1. Every soldier of the Army of the United States who shall have served or may serve, honestly and faithfully, twenty years in the same.”
This referred only to soldiers of the Regular Army.
“2. Every soldier and every discharged soldier, whether regular or volunteer, who shall have suffered by reason of disease or wounds incurred in the service and in the line of his duty, rendering him iiicapable of further military service, if such disability has not been occasioned by his own misconduct.”
*176 This specification would of course include pensioners for “disease or wounds incurred in the service and in the line of duty.”
By the operation of section 1, requiring previous contribution to the funds of the Home by all who became members of it, no l>ensioner who had not contributed to those funds could become a member. This excluded all soldiers pensioned before the act of 1851 was passed; for they could not possibly have contributed to funds which had no existence until after that act took effect.
To prevent this exclusion, this proviso of section 5 of that act was inserted:
“ Provided, That any pensioner on account of wounds or disability incurred in the military service, although he may not have contributed to the funds of the institution, shall be entitled to all the benefits herein provided, upon transferring Ms pension to said asylum for and during the period that he may voluntarily continue to receive such benefits.”
The result of these two provisions was, as regards pensioners, to divide them into two classes, those pensioned before and those pensioned after the act of 1851. The former were required to surrender their pensions on entering the Home; the latter were not. The unjust and unfortunate character of this discrimination could not, in the nature of things, practically appear until the lapse of sufficient time after the passage of the act for soldiers to become disabled by disease or wounds incurred after that time, all of whom would necessarily have contributed to the funds, and therefore could not have been required to surrender their pensions. When such began to enter the Home, the unjust character of the law was practically displayed in requiring one who had been pensioned before the act of 1851 to make his contribution to the funds by giving up his pension, while one pensioned after that act, and who had out of his pay contributed even no more than a single payment of 25 cents, could have all the benefits of the Home and keep his pension besides.
This condition of things evidently required a corrective, which was applied by section 6 of the above-mentioned act of March 3,1859, as follows:
“All pensioners on account of wounds or disability incurred in the military service shall transfer and surrender their pensions to the institution for and during the time they may remain therein and voluntarily continue to receive its benefits.”
*177 After tbis enactment no pensioner could enter tbe Home without surrendering bis pension; and so stood tbe law up to tbe time of tbe Revised Statutes. Did tbe Revised Statutes change that law? Tbe claimant contends that they did; tbe defendants insist that they did not.
Before looking to tbe particular section of tbe revision by which tbe decision of tbis question must principally b.e effected.. I will advert to some doctrines bearing on tbe interpretation of statutory revisions which I consider sound.
1. It has been held in several States that when the law antecedently to a revision was settled either by clear expressions in tbe statutes or adjudications on them, tbe mere change of phraseology in tbe revised act shall not be deemed a change of tbe law, unless such phraseology evidently purports, and palpably requires tbe courts to bold, an intention in tbe legislature to work a change. (Taylor v. Delaney, 2 Caines’ Cases, 113; Yates’ Case, 4 Johns., 317, 359; Mooers v. Bunker, 9 Fos., 420; Burnham v. Stevens, 33 New Hamp., 247; Ash v. Ash, 9 Ohio St., 383; Van Camp v. Board of Education, id., 406; Conger v. Barker, 11 id., 1; Croswell v. Crane, 7 Barb., 191.)
2. Where a section in a revision was intended as a substantial re-enactment of three sections of a previous act, it was held in Kentucky that neither tbe mere change of phraseology nor tbe fact that tbe substance of three sections was embodied in one authorized tbe inference that any radical modification of the law itself was intended. (Overfield v. Sutton, 1 Met. Ky., 621.)
3. When the general laws of a State were in tbe shape óf a code, and a revision thereof was bad, which separated tbe various provisions and transposed and distributed them under different beads in different. statutes, it was held in Wisconsin that tbis change of arrangement furnished no'evidence that tbe legislature intended to limit or change tbe appbcation (Buckstaff v. Hanville, 14 Wis., 77), and that tbe scattered provisions were to receive tbe same interpretation as when the code constituted one act. (Smith v. Smith, 19 Wis., 522.)
4. It was held by tbe Supreme Court of New York, Cowen, J., delivering tbe opinion, that in ascertaining tbe intent of tbe legislature in a revision of statutes tbe court might look to tbe marginal notes of tbe revisers for aid. (Douglass v. Howland, 24 Wend., 35, 46.)
These rulings seem to me to cover tbe main points in regard *178 the interpretation of revisions of statutes and to be entitled to great weight. Guided by them, in connection with section 5595, I proceed to inquire whether the Revised Statutes do in fact change the previous law in relation to surrenders of pensions by members of the Home.
As before shown, section 6 of the act of 1859 required all pensioners to surrender their pensions on entering the Home.
The claimant contends that that provision is not to be formd in the revision, but a different one, in section 4820, which in •effect sets aside section 6 of the act of 1859 and reinstates the provisions of the act of 1851, the unjust character of which has been shown. Section 4820 is as follows :
“ The fact that one to whom a pension has been granted for wounds or disability received in the military service has not contributed to the funds of the Soldiers’ Home shall not preclude him from admission thereto. But all such pensioners shall surrender their pensions to the Soldiers’ Home during the time they remain therein and voluntarily receive its benefits.”
Did Congress intend in this section to legislate or merely to embody existing law ? In deciding that point, the words should be studied, not by themselves, nor merely in connection with the other provisions of that chapter, but in connection with the whole act promulgating the revision; and hence the influence of section 5595 in their interpretation.
Upon examining that chapter, I find that it embodies all the provisions of the acts of 1851 and 1859, except one of a temporary character, and another not bearing on this case, which had probably been previously repealed. And all those provisions are retained in the revision, in large part, in the very words of those acts. The only instance in which such a change in phraseology and arrangement was made, as fairly to admit of question as to the intent of Congress, is section 4820.
From the results of that examination, taken in connection with the general terms of section 5595, I am led to the general conclusion that, prima facie, Congress did not, in that chapter, intend to legislate in regard to th,e Home, but merely to revise and consolidate existing laws.
But yet it may be that Congress did intend to legislate; and in order to consider that question properly I must, in direct connection, again quote section 4820:
“The fact that one to whom a pension has been granted for wounds or disability received in the military service has not *179 contributed to tbe funds of the Soldiers’ Home shall not preclude him from admission thereto. But all such pensioners shall surrender their pensions to the Soldiers’ Home during the time they remain therein and voluntarily receive its benefits.”
It is claimed that the word such,” in the second sentence there, confines the operation of that sentence to pensioners who had not contributed out of their pay to the funds of the Home; and that, as the claimant had so contributed, he is not required to surrender his pension.
In considering this position, the point is whether either of the two clauses of that section is new matter, or whether the section is made up of parts of previous laws. If the former, it is legislation; if the latter, it is only revision and consolidation. That the two sentences are of the latter description I have not a doubt, for I,have examined the draft of the revision by the commissioners, as reported by them to Congress, and find that opposite section 4820, in the margin, are references to section 5 of the act of 1851 and section 6 of the act of 1859, as the places from which the two sentences of section 4820 were taken. But much higher and more conclusive evidence of the intention of Congress is afforded by a comparison of section 5 of the act of 1851 with the first sentence of section 4820, and of section 6 of the act of 1859 with the second sentence of that section.
In the first comparison the provisions stand as follows :
" Section 5 of act of 1851. — Any pensioner on account of wounds or disability incurred in the military service, although he may not have contributed to the funds of the institution, shall be entitled to all the benefits herein provided.
" First sentence of section 4820. — The fact that one to whom a pension has been granted for wounds or disability received in the military service has not contributed to .the funds of the Soldiers’ Home shall not preclude him from admission thereto.”
I am entirely unable to discover any difference between those provisions except in phraseology. In my view, they both mean the very same thing.
Comparing section 6 of the act of 1859 with the second sentence of section 4820, they stand as follows:
" Section 6 of act of 1859. — All pensioners on account of wounds or disability incurred in the military service shall transfer and surrender their pensions to the institution for and during the time they may remain therein and voluntarily continue to receive its benefits.
“Second sentence of section 4820. — But all such pensioners *180 shall surrender their pensions to the Soldiers’ Home during the time they remain therein and voluntarily receive its benefits.”
Between these two provisions I am equally unable to discern any shade of difference, except that made by the insertion of the Avord “ such.” To my mind, then, it is clear that section 4820 was made up of those tAAo provisions from the acts of 1851 and 1859, of which it would have been a complete reproduction but for the insertion of that one Avord. Does that insertion chang’e the meaning', and thereby show an intention in the commissioners and in Congress to change the law 1 I think not, on the folloAving grounds:
1. In my opinion, the Avhole difficulty grows out of an inadvertence of the commissioners in their effort to combine' in one section tAAo separate jn’OAdsions taken from two several acts; and the inadvertence consisted in placing the provisions together in the chronological order of their original enactment, instead of giving them in an order which would unmistakably have retained the Iuav as it was. Transpose the sentences and leave out the words “but” and “such,” and the section would read thus:
“All pensioners shall surrender their pensions to the Soldiers’ Home during the time they remain therein and Amluntarily receive its benefits. The fact that one to whom a pension has been granted for wounds or disability received in the military service has not contributed to the funds of the Soldiers’ Home shall not preclude him from admission thereto.”
So framed, it Avould exactly embody and express the previous law.
But is it an admissible mode of finding legislative intention thus to transpose sentences % I think it is. The real question is not whether it is arranged in the most perspicuous and convenient way, but whether the previous law is so clearly retained in the revision that, notwithstanding the changed arrangement of sentences, it can fairly and legitimately be seen to be in reality the same. Careless unskillful, unsystematic, and illogical aarangement of sections, clauses, sentences, and words in American statutes are too prevalent to be allowed to defeat the manifest intention of the legislature. If, as in this case, one arrangement of sentences in a section of the revision Avould seem to indicate an intention to change the previous law, while another arrangement makes it quite clear that a change was not intended,.! have no doubt that the latter should be adopted; *181 for it coincides with, the judicial presumption that a revision is intended to embody the existing law, and also fulfills the express declaration of section 5505, that the Revised Statutes embrace the statutes * * * in force on the 1st day of December, 1873.”
2. Other considerations tend to the same conclusion, and are proper to be adduced, as aiding the judicial mind to discover the intention of Congress in making and promulgating the revision. The question properly and quite inevitably arises, AThy should Congress, out of all the provisions of the acts of 1851 and 1859, have selected this particular one for a change ? Can it be justly claimed that the act of 1859, requiring all pensioners to surrender their pensions, worked an injustice or hardship which appealed to Congress for relief 9 I have heard no such claim. On the contrary, it is clear to me that the act of 1851 perpetrated a gross injustice (afterward removed by the act of 1859) when it took away his pension from an old and perhaps totally disabled pensioner because he had not contributed what he had not had the opportunity to contribute, and allowed a young and only partially-disabled pensioner to have all the benefits of the Home and keep his pension besides, merely because he had contributed 12£ cents, or, as in the case of this claimant, $4.57, out of his pay to -the funds of the Home.
Of course I understand that this view should not necessarily control the interpretation of plain and clear words; but when the question is not as to the meaning of certain words in an act of original legislation, but whether it was the intention of Con-' gress, by the use of those words in a revision, to reinstate on the statute-book a former system, which more than fifteen years-before it had by amendatory law condemned and cast out, then the unjust character of that system affords ground for presuming that Congress did not intend to return to it.
The conclusion that they did not so intend is enforced by the consideration that neither the commissioners nor Congress, if they in fact intended to make a change, would probably have attempted it by the mere interpolation of a word of reference, but would have expressed their intention in direct and plain terms.
The conclusion at which I have thus arrived is attainable, also, by an examination of the text of section 4820, in regard to which I am satisfied with the views expressed by the Attor *182 ney-General in bis opinion given to tbe Secretary of tbe Interior, as follows:
“But tbe same conclusion is reached by a more strictly grammatical interpretation of section 4820. Thus tbe words ‘all sueb pensioners/ in tbe second sentence of that section, may be taken to refer to all pensioners wbo come within tbe words of description used in tbe preceding sentence, namely, ‘one to •whom a pension bas been granted for wounds or disability received in tbe military service.’ Tbe ‘fact’ mentioned in sucb preceding sentence, that ‘be bas not contributed to tbe funds/' is not descriptive of tbe pensioner, but of a circumstance or condition which may or may not be affirmed of tbe pension already described.
“Had tbe design been to limit tbe application of tbe second sentence to a pensioner wbo bas not contributed, tbe legislature, instead of saying, ‘But all sucb pensioners shall surrender their pension/ &c., would probably have said, ‘But in sucb case tbe pensioner shall surrender bis pension/ &c., or have employed some equivalent expression referring to tbe circumstance or condition above mentioned as well as to tbe pensioner.”
But even supposing that tbe letter of section 4820 can be forced into tbe construction placed upon it by tbe court, tbe question then is whether that construction shall prevail against tbe clearly-expressed intent of Congress to embody in tbe revision tbe law as it previously stood. A sound principle in statutory construction is thus formulated by high judicial authority, that a thing wbicli is within tbe intention of tbe makers of a statute is as' much within tbe statute as if it were within tbe letter, and a thing which is within tbe letter of tbe statute is not within tbe statute unless it be within tbe intention of the makers. (People v. Utica Ins. Co., 15 Johns., 358, 381; Jackson v. Collins, 3 Cowen, 39; Canal Co. v. Railroad Co., 4 Gill & Johns., 1.) And in "Vermont I find a case which so clearly,, sensibly, and ably supports tbe second clause of that formula 'and is so apposite to tbe present discussion, that I present tbe following extracts from tbe opinion of tbe court:
“It is urged that when tbe language of a statute is plain, clear, and intelligible, it is itself tbe best, and should be the only, expositor of tbe meaning of tbe legislature. Theoretically, this argument would seem to furnish a safe rule of interpretation; practically, it is not always safe or sensible. A rigid adherence to it wouid not unfrequently involve us in contradictions, absurdities, and palpable violations of tbe real intention of tbe legislature. Tbe ignorance and inexperience of some legislators; tbe inability of even tbe wisest to foresee all*tbe bearings and *183 connections of an act; tbe great number of statutes proposed for enactment and tlie variety of minds that modify and amend them; tbe baste of legislation; tbe imperfection, of language, and want of skill, accuracy, and perspicuity in tbe use of it; and, not unfrequently, want of accuracy and clearness of ideas; these all contribute to produce errors, imperfections, and inconsistencies in tbe phraseology of statutes. Hence, tbe letter of tbe law is found by experience not to be in all cases a correct guide to tbe true sense of tbe lawgiver; hence have arisen those rules for tbe construction of statutes which look to tbe whole and every part of a statute, and tbe apparent intention derived from tbe whole, to tbe subject-matter, to tbe effects and consequences, and to tbe reason and spirit of tbe law, and thus ascertain the true meaning of tbe legislature, though tbe meaning so ascertained conflict with tbe literal sense of tbe words. * * * • Illustrations and authorities are unnecessary to sustain a principle so well settled. We may, however, refer to one derived from an old book, which, in its treatise on this subject, Judge Story calls ‘an excellent summary of tbe rules for construing statutes,’ and which for its sense and point is worthy of attention:
“ ‘ In some cases, tbe letter of an act of Parliament is restrained by an equitable construction; in others, it is enlarged; in others, the construction is contrary to the letter. In order to form a right judgment whether a case be within tbe equity of a statute, it is a good way to suppose tbe lawmaker present, and that you have asked him this question: Did you intend to comprehend this case? Then you must give yourself such answer as you imagine be, being an upright and reasonable man, would have given. If this be that be did mean to comprehend it, you may safely bold tbe case to be within tbe equity óf tbe statute; for while you do no more than be would have done, you do not act contrary to tbe statute, but in conformity thereto.’ (Bacon’s Abridgment, Title Statutes.)
“Applying this rule to tbe case at bar, we think all must agree that if tbe lawmaker were present and so interrogated, be would answer that be did not intend to comprehend it within this statute. To bold to the contrary would attribute to this section a meaning repugnant to tbe whole spirit and reason of the statute, in direct conflict with other sections of tbe act and with tbe very basis of all our legislation on tbe subject.” (Ryegate v. Wardsboro, 30 Vt., 746.)
Influenced by these views, tbe Supreme Court of Yermont decided that tbe law before them did not mean what its words plainly imported.
Many other cases might be cited where courts have given a meaning to a statute directly contrary to its letter; but there is no need to cumber this already long opinion by their citation. *184 Suffice it to say tliat tbe letter of sectiou 4820, construed as tbe claimant desires, is contrary to tbe spirit and intent of Congress in tbe Revised Statutes, as expressed in section 5595, and rests upon a narrow and strained interpretation, wbicb seems to me to stick in tbe bark and not to reach tbe core of tbe question.
In every light in wbicb I have been able to view tbe subject, my unhesitating conclusion is that Congress intended tbe law applicable to this case to remain in statu quo, and it does in fact so remain; and therefore that tbe claimant has no right to recover tbe amount of bis pension-money wbicb has during bis membership in tbe Soldiers’ Home been paid over to that institution.