## FARMERS and MECHANICS BANK *vs.* KERCHEVAL.

A bond having been executed by defendant to plaintiffs, reciting: That whereas, P. C. & Co., were then, or might thereafter become indebted to plaintiffs, in divers sums of money, and might become liable from time to time, to pay plaintiffs divers sums of money, to the amount of $3000, by means of notes, discounts, and over-drafts made and endorsed by said P. C. & Co., and for their benefit, and conditioned that if said P. C. & Co., should pay, or cause to be paid to plaintiffs, all and singular, the notes, &c., made by said P. C. & Co., and for their benefit, to the amount of $3000, and should pay or cause to be paid to said plaintiffs, all said liability assumed by the said P. C. & Co., to the amount of $3000, then said obligation to be void, otherwise to remain in full force and effect for three years from January 1, 1837, unless notice to the contrary should sooner be given to the plaintiffs: Held, that the bond was a continuing guaranty, and intended to cover successive notes, discounts, and over-drafts, made by P. C. & Co., at any time within the limited period, as often and whenever the antecedent transactions were discharged: Held, also, that demand of the principal, and notice to the guarantor, at the close of the period covered by the guaranty was not necessary.

Notice of the acceptance of a guarantee by the creditor, is not required to be given to the guarantor.

No-general rule can be laid down in respect to demand and notice in the case of guaranties, but where, from the terms of a guaranty, or the facts disclosed in a given case, demand and notice is required, the omission of demand and notice cannot be available as a defense, unless the defendant can show that he has suffered loss or damage thereby.

Where a guarantor obligated himself to pay all the liabilities up to a sum certain, of the principal for advances by way of notes, &c., if the principal should fail to pay the same, such obligation "to remain in full force and virtue for the space of three years from the 1st day of January, 1837;" and for the notes constituting the indebtedness so guarantied, new notes, were taken within the three years, falling due after the three years: Held, that such credit to the principal, beyond the time limited in the bond, was in contravention of the contract of the guarantor, and discharged his liability as surety.

Plaintiffs, in renewal of the notes of a firm, which they held, and which were secured by the guaranty bond of a surety, took the individual notes of a member of the firm, payable at a future time, signed in this wise: "For late firm of Pease, Chester & Co. Wm. J. Pease." Held, that although time might not be given thereby, to all the members of the firm, it was given to the maker of the renewal notes, and the surety was consequently discharged from his obligation.

*Case reserved from Wayne Circuit.*

This was an action of debt brought on the following bond:

"Know all men by these presents, that I, Benjamin B. Kercheval, of the town of Detroit, in the County of Wayne, and State of Michigan, am held and firmly bound unto the President, Directors, and Company of the Farmers and Mechanics Bank of Michigan, in the penal sum of six thousand dollars, to be paid to the said President, Directors, and Company of said Bank, or to their assigns or legal successors in office, to the which payment well and truly to be made, I bind myself, my heirs, executors, and administrators, each and every of them, firmly by these presents. Sealed with my seal; dated this eighth day of May, A. D., 1837.

"Now the condition of this obligation is such, that, whereas, Pease, Chester, & Co., are now or may hereafter be indebted to said President, Directors, and Company of the Farmers and Mechanics Bank of Michigan, or their assigns or legal successors in office, in divers sums of money, and may from time to time become liable to pay to the said President, Directors, and Company of said Bank, divers sums of money to the amount of three thousand dollars, by means of notes, discounts, and over-drafts, made or endorsed by the said Pease, Chester, & Co., and for their benefit: Now, therefore, if the said Pease, Chester, & Co.

shall pay or cause to be paid to the said President, Directors, and Company of said Bank, their assigns or legal successors in office, all and singular the notes, discounts, and over-drafts made by the said Pease, Chester, & Co., and for their benefit, to the amount of three thousand dollars as aforesaid, and shall pay or cause to be paid to the said President, Directors, and Company of said Bank, or to their assigns or legal successors in office, all said liability assumed by the said Pease, Chester & Co. to the amount of three thousand dollars as aforesaid, and shall pay or cause to be paid to said Preisdent, Directors, and Company of said Bank, their assigns or successors in office, all costs, charges, and expenditures that may accrue by collection of said sum, or any part thereof, by due process of law, and shall save harmless from all and every such advance made to the said Pease, Chester & Co., and for their benefit, then and in that case, this obligation to be void, otherwise to remain in full force and virtue for the space of three years from the first day of January, A. D. 1837, unless notice is given to the said President, Directors & Co., of the Farmers and Mechanics Bank, to the contrary."

To the declaration, defendant plead the general isssue, and gave notice of the special matter following; that the plaintiffs gave time to the principal debtors mentioned in the bond, for the payment of the notes, &c., and continued to give time thereupon, from time to time, *until the* months of January and February, 1842; that the notes of the firm of P., C. & Co., were given to the said Bank, for the amount specified in the bond, and that said notes were paid and renewed *from time to time,* until November and December, 1841; when in renewal *of notes of the* same indebtment, plaintiffs accepted and received for the same indebtment specified in the bond, four certain promissory notes, payable at future periods, each signed, "For the late firm of Pease, Chester & Company: Wm. J. Pease." And further, that said firm of Pease, Chester & Co., did pay to the plaintiffs, for money advanced to them, &c., divers sums of money, to the amount of $3000, according to the condition of the said bond; and further, that no notice was given to the defendant of the amount of the several sums of money advanced to said firm, either by way of note, discount, overdrafts, or of the non-payment of the same, nor of the amount remaining due, and claimed of the said defendant, at the expiration of the three years specified in the bond.

On the trial of the cause, the execution of the bond was admitted, and the questions of law arising upon the pleadings, and the following statement of facts, agreed to by written stipulation, were reserved for the consideration of this Court.

On the 8th day of May, the date of the bond, Wm. J. Pease, John Chester, and Tarleton Jones, were partners in trade, under the name and style of Pease, Chester & Co., and so continued until January 1st, 1840, at which time the firm was dissolved, and notice of the dissolution given in the newspapers of the city of Detroit, their place of business, and that the business of said firm would be closed by Wm J. Pease, one of the partners.

At the time of the expiration of the bond, said firm was indebted to the plaintiffs in the sum of $3,500, by reason of notes, discounts, and over-drafts, made and indorsed by them prior to that period, from time to time, and upon transactions continuing during the period of three years, between January 1st, 1837, and the 1st day of January 1840; during which period said firm paid the plaintiffs on said notes, discounts, and over-drafts, more than $3000, leaving, however, the above balance due upon said discounts, notes, and over-drafts, for said period. The notes constituting this indebtedness, four in number, all fell due after January 1st, 1840, and were all taken in renewal of several notes previously discounted, and all of which, except one, were several times previously renewed. After the dissolution of the firm of Pease, Chester & Co., Pease assuming to act for the firm, but without authority other than his general authority to settle the affairs of the firm, contained in the notice of dissolution, executed four notes to the plaintiffs, for the respective amounts of the four notes before mentioned, for and on account of said indebtedness of said firm to the plaintiffs, and the plaintiffs' cashier delivered to said Pease the four notes of the firm. The notes so executed by Pease, were signed, "For the late firm of Pease, Chester & Co.: Wm J. Pease;" and the notes were renewed from time to time, in the same manner, by Pease, assuming to act for said firm; and all said renewal notes, signed by said Pease for said firm, but without other authority than above specified.

No notice was given to the defendant of the non-payment of said balance by said firm, or of the giving and non-payment of any note,

discount, or over-draft, constituting a part thereof at the making thereof, or at the time it fell due, or immediately after the expiration of the three years mentioned in said bond; but defendant had notice of the balance due, previous to the commencement of the suit, and that the plaintiffs expected payment from him.

*Barstow & Lockwood*, for plaintiffs.

*Joy & Porter, and A. D. Fraser*, for defendant.

By the Court, WHIPPLE, J.

The first question presented for our consideration, is, whether the bond was intended as a continuing guaranty to the amount of $3000 for the period of three years, commencing on the 1st of January 1837, and ending on the 1st of January, 1840. The plaintiffs insist that this is the only reasonable construction to be given to the bond; on the other hand, while it is admitted by the defendant, that successive advances, to the amount of $3000 might be made during the period covered by the guaranty, yet it is contended that when advances to that amount are actually made, the thing contemplated in the recital has occurred, and that upon the payment by Pease, Chester & Co. of such advances, the condition of the bond was fulfilled. During the argument, adjudged cases were referred to by counsel on both sides, which, in their facts and circumstances were supposed to bear a close analogy to the case under consideration. These cases have been carefully examined. To analyze them and show their application to the question I am now discussing, would extend this opinion to an unreasonable length, without attaining any valuable end. Guaranties of this description have assumed every imaginable form, and while some aid may be derived in expounding them, from adjudged cases to be found scattered in the English and American Reports, it may be confidently affirmed that the safest guide to follow, is the application to the facts of each case, of those rules of interpretation peculiar to this class of contracts, and which rest on the solid foundation of good sense, and the uniform opinion of the most enlightened jurists. It is proper to observe that commercial guaranties are frequently written without that care usually bestowed

upon instruments of a more solemn character, and by persons who do not profess any knowledge of those technical rules which are applied to the construction of written instruments. They are often written without special regard to the language employed, or to the collocation of words or sentences. This carelessness has been the fruitful source of perplexing litigation. In their interpretation, therefore, a wide latitude is necessarily allowed in discovering the intention of the parties, and it is the duty of Courts to reject those subtle and refined distinctions sometimes resorted to in expounding other instruments. While it is true that persons standing in the relation of sureties will not be held, unless an intention to bind themselves is clearly manifested, it is to be remembered that guaranties have come to be extensively used in commercial transactions, and that a narrow and restricted rule should not be applied to relieve parties to such instruments from what appears to have been engagements fairly and voluntarily assumed. We cannot, then, sanction the rule of construction so strongly insisted upon in argument, and hold instruments of this nature to be *strictissimi juris* as to their interpretation.

The case does not disclose the precise nature of the business in which Pease, Chester & Co., were engaged, but enough is exhibited to show that it was of a character which rendered frequent transactions with the bank necessary, during the existence of the co-partnership, which continued three years. Keeping in view the principles and facts to which I have adverted, the question reverts, whether the guaranty contained in the bond is a continuing guaranty, or whether it was intended to cover advances to the extent of $3000, and ended when payment of that amount was made. After a careful consideration, I am of opinion that the more enlarged construction contended for by the plaintiffs, is correct, and that the guaranty was intended to cover successive advances made to the firm during the entire period specified in the bond, and that the defendant rendered himself liable to the extent specified in the condition of the bond, for any balance that might be found due the bank on the 1st of January, 1840. This conclusion seems to flow necessarily, from the language and manifest object of the bond. A contrary construction is utterly irreconcilable with the intention of the parties, to be gathered from a survey of the whole instrument. The recital

"that whereas, Pease, Chester & Co., are now, or may hereafter, *from time to time,* become indebted to said President, Directors & Co. of the Farmers and Mechanics Bank of Michigan, &c., in *divers sums of money,* and may *from time to time* become liable to pay to the said President &c., *divers sums of money,* to the amount of three thousand dollars," &c., is conclusive to show that a series of transactions was contemplated, and is utterly irreconcilable with the idea that a single transaction was intended, or that successive advances to the amount of $3000, being made by the bank, and re-paid by Pease, Chester & Co., determined the liability of Kercheval. Again, Kercheval's obligation is, at the conclusion of the bond, to continue "for the space of three years from the 1st of January, 1837, unless notice is sooner given." This language very clearly imports a continued liability for the period specified, and seems repugnant to the notion advanced in argument, that a credit given of $3000, and its re-payment, put an end to Kercheval's liability. This view appears to me so obvious, that I forbear a particular examination of a large number of cases which have come under my observation, and will content myself with a general reference to a few, which abundantly sustain the opinion I have expressed upon this feature of the case. (See *Mason* vs. *Prichard,* 11 *East.,* 227; *Clark* vs. *Burdell,* 2 *Hall,* 197; *Hargreave* vs. *Smee,* 6 *Bing.,* 224; *Douglass et al.,* vs. *Reynolds et al.,* 7 *Pet.,* 113; *Barton* vs. *Bennett,* 3 *Camp.,* 220; 2 *Howard,* 42; *Williams et al.,* vs. *Rawlinson,* 11 *E. C. L.,* 34.)

Upon the assumption that the liability of Kercheval was continuous, it is further contended on his behalf, that when all the transactions between the bank and Pease, Chester & Co., under the guaranty, were closed, notice of the amount for which the guarantor was held responsible, should have been communicated to him within a reasonable time. It is not to be disguised, that in respect to this question, there has been a wide diversity of opinion among American jurists. It is asserted by counsel to be a general principle of the law of guaranties of universal obligation, irrespective of the form in which they are given. As notice is not expressly required by the terms of the bond, it becomes necessary for the defendant to establish the principle for which he contends. Is it then, true, that notice in all cases, and under all circumstances, is an incident of the contract of guaranty?

If this question is answered in the affirmative, it must be on the principle that "where an agreement is of known and general nature, it is understood to express the circumstances which are commonly incident to it; these are necessarily presumed to be in the contemplation of the parties." Let us now see, how far instruments of the nature I am considering, are controlled by any established principle of law, or affected by commercial usage, well known to commercial men, and sanctioned by a series of judicial decisions of unquestioned authority.

The case most strongly relied on by the defendant's counsel to support the legal theory they have advanced, is reported in (7 *Pet.*, 113;) Douglass *et al. vs.* Reynolds *et al.* This action was on a letter of credit written by Douglass & Co., authorizing Reynolds & Co. from time to time to aid one Haring by advances of cash, acceptances, or indorsements, and that they would be responsible for a sum not exceeding $8,000. This was held by the Supreme Court of the United States to be a continuing guaranty, and intended to cover successive advances, acceptances, and indorsements, to the amount of $8,000, at any subsequent times, *toties quoties,* whenever the antecedent transactions were discharged. This decision confirms, very strongly, the views I have taken respecting the construction of the bond in question. It was further held, that in order to entitle the plaintiffs to recover, they must prove that notice had been given to the defendant of that fact in a reasonable time after the guaranty had been accepted. Some general reasons are given in support of this proposition, but no cases are cited to confirm its accuracy. Whatever views we may be inclined to take of this question upon a case presenting the same state of facts, it is unnecessary to determine, but we think that no notice of acceptance, other than that which the law implies, was necessary in the case before us. The bond is an original collateral agreement, absolute in its terms, limiting the liability of the defendant, and the time within which credit was to be given. The delivery of the bond by the defendant, and its acceptance by the bank, were contemporaneous acts; this is all the notice of acceptance the law exacts. In the present case, as in the one cited, it is also clear that notice of each successive advance was not required. But the Court further held, "that when the transactions between the plaintiffs and Haring under the guaranty were closed, notice

of the amount for which the guarantors were held responsible, should, within a reasonable time afterwards, be communicated to them." In support of this ruling, Mr. Justice Story remarked, that, "by the very terms of the guaranty, as well as by the general principles of law, the guarantors are only liable upon the failure of the principal debtor to pay the debt. A demand upon him, and a failure on his part to perform his engagements, are indispensable to establish a *casus fœderis.*" It was upon this reasoning that the principle I am now discussing was upheld. No cases, English or American, are arrayed in its support. The guaranty, in that case, certainly does not, *in terms,* require a notice; if a notice, therefore, was indispensable to establish a *casus fœderis,* it must result from some general principle of law, by which notice is made an indispensable incident to the contract of guaranty, and presumed, therefore, to be in the contemplation of the parties.

I have given to this question a very careful and extended examination, and confess myself unable to extract from the English cases on this subject, a principle co-extensive with that laid down by the Supreme Court of the United States. That it is not supported by the subsequent decisions of that learned tribunal, and is restricted in an important sense, by the eminent Judge who pronounced the opinion, in cases involving the same principle, it will now be my endeavor to show. The case of Reynolds *et al., vs.* Douglass *et al.,* was again brought before the Supreme Court of the United States, and is reported in (12 *Pet.,* 497.) It will be remembered that the action was founded on a guaranty, the terms of which have been stated. On the trial, eight bills of exchange drawn by Haring on the plaintiffs, amounting to $8000, and which were accepted and paid by the plaintiffs, were given in evidence. In delivering the opinion of the Court, Mr. Justice McLean says: "The question is fairly raised whether the insolvency of Haring, either prior to, or at the time of payment, will excuse the plaintiffs from making a demand on him, and giving notice to the guarantors." After an examination of cases, English and American, on the subject of notice, the learned Judge proceeds to remark, that "the rule is well settled, that the guarantor of a promissory note is bound, without notice, where the maker of the note was insolvent at its maturity. That his liability continues, unless he can show that he has sustained some prejudice by

want of notice of a demand on the maker of the note, and non-payment." "In the case before us," (continues Judge McLean,) "there is no pretense that the defendants have sustained any injury from a neglect of the plaintiffs to make a demand on Chester Haring for payment of the balances against him in the account current." And again: "But if the defendants could prove they had suffered damage by the neglect of the plaintiffs to make the demand and give notice, according to the case of Van Wart *vs.* Woolley, (3 *Barn. & Cres.*, 439,) they could only be discharged to the extent of the damage sustained." In the case of the Louisville Manufacturing Company *vs.* Welch, (10 *Howard*, 461,) the same question was fully considered by the Supreme Court of the United States, and the rule as laid down in (12 *Peters*, 497,) was reaffirmed. In reviewing the case in (7 *Peters*, 126,) Mr. Justice Nelson uses this language: "When the case came before the Court a second time, which is reported in (12 *Pet.*, 497,) the principle here stated was somewhat qualified, the Court holding, that in case of the insolvency of the principal debtors, &c., the demand and notice might be dispensed with." After referring to the distinction between the liability assumed by a guarantor, and that of the drawer or indorser of commercial paper, Judge Nelson affirms that the former are held liable in the absence of any demand and notice, unless some damage or loss has been sustained by reason of the neglect. In discussing the necessity of demand and notice, when the transactions are closed, and the amount for which the party intended to look to the guarantor for payment, is ascertained, the learned Judge further remarks: "We perceive no reason why the rule in respect to notice should be more strict in this stage of the dealings of the parties, than at the time when the debt becomes due; or that the guarantor should be discharged for the delay in giving notice, when no loss or damage has resulted to him thereby." These adjudications show, very conclusively, that the doctrine in respect to demand and notice, as stated in (7 *Pet.*, 126,) has been qualified in a very important particular, by the Supreme Court of the United States, and it may be safely assumed that it is no longer regarded as authority by that tribunal.

The opinion pronounced by Mr. Justice Story, in the case of Wildes *et al. vs.* Savage, (1 *Story R.*, 22;) contains a full vindication of the

ruling of the Supreme Court in the cases of Reynolds *et al. vs.* Douglass *et al.*, (12 *Pet.* 497;) and of the Louisville Manufacturing Company *vs.* Welch, (10 *How.*, 461.) The doctrine of these cases is sustained in the following clear and pointed language: "I take the doctrine to be clearly settled, that upon a guaranty, to discharge the guarantor, there must not only be a want of notice within a reasonable time, but there must also be some loss or damage sustained by the guarantor, and that if there be a loss or damage, that the guarantor is not totally discharged, but only *pro tanto* to the amount of the loss or damage." The learned Judge illustrates this rule by the following example: "If the debtor is solvent when the money becomes due, and no notice is given to the guarantor, and the debtor afterwards, and before notice, becomes insolvent, the guaranty is discharged." The case last cited, is in affirmance of the same principle established in the case of Cremer *vs.* Higginson *et al.*, (1 *Mason*, 323;) as early as 1817. It is there said, that "if notice was not given in a reasonable time, nor until after a material change in the circumstances of the debtors, such laches of the plaintiffs was a complete discharge of the defendants from their guaranty." In the case of Cannon *vs.* Gibbs, (9 *Serg. & Rawle*, 202;) it is held that the guarantor is discharged where the drawer or indorser are solvent at the time the note became due; but when both are insolvent, notice might be dispensed with, the presumption being that the guarantor was not prejudiced by the want of notice. To the same effect is the opinion of the Supreme Court of Massachusetts, in the case of the Oxford Bank *vs.* Haynes, (8 *Pick.*, 423.) The opinion of Mr. Justice Cowen, in Douglass *vs.* Howland, (24 *Wend.*, 35;) contains a very extended and careful review of the cases on this subject, and arrives at the conclusion, that the doctrine contended for by the defendant is unsupported by any English case, and has no foundation in English jurisprudence. My own researches have conducted me to the same conclusion. Warrington *et al. vs.* Fowler *et al.*, (8 *East.*, 242;) Van Wart *vs.* Woolley, (3 *Barn. & Cress.*, 439;) Holbrook *vs.* Wilkins, (1 *Barn. & Cress.*, 10;) Hitchcock *et al. vs.* Humfrey, (44 *Eng. Con. Law*, 296;) are a few of the English cases on this subject. The one last cited seems to have been decided upon the fullest consideration of all the English authorities bearing on the question. This subject was

considered by the Supreme Court of Vermont, in Train *vs.* Jones, (11 *Ver.* 444.) The views of Mr. Justice Redfield sustain to the fullest extent the doctrine that neither demand or notice was required.

Upon principle, I am unable to perceive how this ground of the defense can be sustained. The necessity of demand and notice must, I think, depend upon the nature of the contract, and the intention of the parties. When the intention cannot be clearly ascertained on the face of the contract, in consequence of some obscurity in the language, resort must be had to legal construction, for the purpose of supplying defects of expression. As contracts of guaranty may be infinitely varied, it would seem that no general rule can be laid down, in respect to demand and notice. If there is an absolute guaranty, that a third person shall pay a certain sum, at a specified time, or that the guarantor will undertake the performance himself, it is difficult to comprehend upon what principle diligence can be exacted of the creditor. Where, however, the guarantor restricts his undertakings, a different rule should be applied: if, for instance, his undertaking is, that the debt of a third person is good, or can be collected, it is equally clear that diligence is required. Without devoting further time to this feature of the defense, I think it may be regarded as settled, both upon principle and authority, that if a demand and notice is required, upon the facts disclosed in the record, it cannot be made available as a defense, unless the defendant can also show that he has suffered loss or damage.

The next question presented for our consideration is, whether the liability of Kercheval, under the bond, could be extended beyond the period of three years from the 1st day of January, 1837; or whether, in other words, it was competent for the bank to extend the credit to be given to Pease, Chester & Co., beyond the period of three years. The solution of this question must depend upon the intention of the parties as manifested in the bond. It is not to be disguised that there is a good deal of intrinsic difficulty in determining what that intention was, in consequence of the loose and artificial manner in which the bond is drawn. If it was intended to cast obscurity upon this question, the parties could not have selected language more appropriate to accomplish that purpose. What, then, was the extent of the obligation of Kercheval, to be fairly deduced from a careful survey of the whole instrument?

Stripped of the useless verbiage with which that obligation is clothed, I think it may be thus stated: Whereas, Pease, Chester & Co., are now, or may hereafter become indebted to the Farmers and Mechanics Bank from time to time, in the sum of $3000, by reason of notes discounted by said bank for the said firm; or, in consequence of discounting notes, upon which the said firm appear as indorsers, but for their benefit; or in consequence of over-drafts made by said firm: now, therefore, in order to secure the said bank against any losses growing out of advances made as aforesaid by the said bank to the said Pease, Chester & Co., the said Kercheval agrees that if the said firm of Pease, Chester & Co., shall fail to pay all such advances made by the bank within the period of three years from the 1st day of January, 1837, then the said Kercheval obligates himself to pay all such advances, and any balance that may be found due at the expiration of said period, provided the same does not exceed $3000: Kercheval also obligates himself to pay all costs, charges, and expenses, that may be incurred by the bank, should it have recourse to legal proceedings to collect the sum so advanced: Kercheval reserves to himself the right to put an end to his liability before the 1st January, 1840, by giving the bank notice to that effect.

If I have succeeded in stating in a simple form, the true meaning of the parties to the bond, it now becomes necessary to determine, whether it was contemplated by them that credit should be extended by the bank to Pease, Chester & Co., beyond the specified period, although advances by way of discounts, were actually made within that period.

I have said that the bond contemplated advances *by the bank* to Pease, Chester & Co., from time to time, in either of the forms therein specified; and that to secure the bank against eventual loss, Kercheval agreed to stand in the relation of surety for the firm, for an amount not exceeding $3,000. The reason for adopting this form of security is obvious. It was foreseen by the parties, that the firm would, in the prosecution of their business, require frequent advances, either by way of discounts or over-drafts, and that it would be more convenient that some person, in whose responsibility the bank had confidence, should, by some instrument stand as security for the stipulated amount, during the entire period for which such advances were to be made, rather than adopt the usual mode of procuring an indorser for each separate transaction. Es-

pecially was this necessary, in as much as over-drafts were contempla- plated by the parties, for which the bank would naturally require some security. What construction, then, should be given to that clause in the bond, which declares that Kercheval's obligation shall "remain in full force and virtue for the space of three years from the first day of January, A. D., 1837." From a comparison of this clause with other clauses in the instrument, and the object intended by the bond, I am of opinion, that Kercheval never contemplated that a credit extending beyond the specified period should be given by the bank to Pease, Chester & Co., and that such is the true construction of the bond. What obligation, it may be asked, was to continue in force for three years from the first of January, 1837? The answer to this question, is, I think, that Kercheval bound himself to pay an amount not exceeding $3,000, for advances made to the firm by the bank between the two periods specified in the bond, and for any balance that might be found due on the 1st of January, 1840, in the event of a default on the part of his principals to fulfill the obligation. If a credit extending beyond the 1st of January, 1840, could be given to Pease, Chester & Co., then Kercheval's obligation would also continue beyond that period, and thus the bond which was to remain in force for three years from the first day of January, 1837, might be extended to an indefinite period. The circumstance that his liability covered any balance arising from over- drafts, would seem to strengthen the views I have expressed. If this liability was to arise from discounted paper alone, it might be argued that advances made in this way before the 1st of January, 1840, might be made payable after that time. But it is to be observed that advances by way of over-drafts were contemplated, and I imagine it cannot be contended, with any show of reason, that Kercheval could, under the bond, be liable for over-drafts subsequent to that day.

Another fact may be referred to, as by no means unimportant in giving a construction to the bond. While it does not appear affirma- tively from the case that the co-partnership of Pease, Chester & Co., commenced on the 1st of January, 1837, and was to terminate by its own limitation on the 1st of January, 1840, yet it may reasonably be inferred that such was the agreement, as the co-partnership was in fact dissolved on that day. This may account for the insertion of that

clause in the bond, declaring that it should continue in force for three years from the 1st of January, 1837. If this view be correct, it affords the strongest presumption that the parties did not contemplate a credit extending beyond the continuance of the co-partnership; and that Kercheval had the right, on the 1st of January, 1840, to call at the bank and ascertain and liquidate any advances made to Pease, Chester & Co. covered by the bond, and to be substituted to the rights and remedies of the creditor, or, if he chose, to resort to his remedy in equity, to secure himself against loss. This he was precluded from doing, because the recovery in this case is sought on four notes dated in the months of November and December, 1839, and payable after the first day of January, following. A credit, then, having been extended to Pease, Chester & Co., in contravention of the contract made between the bank and Kercheval, it follows that the latter is not liable.

There is another aspect in which the case may be viewed, equally decisive of the claim set up by the bank. It cannot, with any show of reason, be contended, that Kercheval's liability could be indefinitely extended; but it might be argued, that as advances by way of discounts were to be made by the bank to Pease, Chester & Co., if notes were discounted previous to the 1st of January, 1840, although made payable after that period, Kercheval would be liable upon his bond, provided the notes were discounted according to the well known usages of the bank. This construction of the bond, it may be said, is justified, because the usages of the bank, in respect to the time *usually given on* discounted paper entered into the contemplation of the parties when the bond was executed and delivered. Assuming, then, that this position is well founded, and that the usage of the bank in the particular stated was supported by proof, and that the notes were discounted pursuant to such usage, the question would arise, whether Kercheval has not been released by some act or default of the bank. From the case, it appears, that after the dissolution of the co-partnership, notes in renewal of those discounted previous to 1st of January, 1840, were executed by Pease, for and in behalf of the late firm of Pease, Chester & Co. When these notes were executed, the fact of dissolution was well known to the bank; the notes, themselves, furnished on their face the evidence of the fact. The authority of Pease thus to execute, in the name of the firm, nego-

tiable securities in behalf of the firm does not appear to have been questioned, although it is well settled, that such an act would not bind the late firm, unless a special authority to do the act was conferred upon Pease. Upon this point there is no evidence. If we assume that full authority was given, and that Pease executed the notes in pursuance of said authority, it is then very clear that the time of credit would be extended beyond the period prescribed by the more enlarged and liberal construction of the bond, and that Kercheval is discharged from his liability. If, however, no special authority in fact existed, the notes so given did not bind the firm, but were in law the individual notes of Pease. If the notes, in renewal of which, those executed in the form stated were given, were actually canceled upon the delivery by Pease to the bank of his individual notes, it might be argued that these last operated as payment of the former, and that Kercheval was discharged from his obligation. But it is unnecessary to pass upon the question. The acceptance by the bank of Pease's individual note, in renewal of those executed by the firm, operated as a release of Kercheval. This consequence is legally deducible from such a state of facts; for although time was not given to all the members of the firm, yet time was given to Pease, and until the expiration of the credit given to the latter, the bank could not have sued the several members of the firm. If the bank could not sue, it follows, that Kercheval, by paying the indebtment of the firm, was also precluded from sueing until the expiration of the period of credit given to Pease.

In any view, therefore, that can be taken of this case, it appears to us that upon the facts reported, judgment should be entered for the defendant, and it must so be certified.